UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

YENI LESLIE MONTOYA RAMIREZ
as Personal Representative of the Estate
of ROMAN SCARFO, deceased,

CASE NO.: 3:25-cv-00181

    Plaintiff,

vs.

UNITED STATES OF AMERICA,

    Defendant.
_____/

## COMPLAINT FOR WRONGFUL DEATH

Plaintiff, Yeni Leslie Montoya Ramirez as Personal Representative of the Estate of Roman Scarfo, deceased, by and through the undersigned counsel, sues the Defendant, the United States of America and alleges as follows:

1. This action arises out of a fatal aircraft crash on September 13, 2020, in Steinhatchee, Florida.

**Jurisdictional Allegations**

2. Plaintiff, Yeni Leslie Montoya Ramirez, is a resident of Manatee County, Florida and was duly appointed the Administrator of Roman Scarfo's estate on November 3, 2020, by the Circuit Court for the Twelfth Judicial Circuit of Sarasota County, Florida, Case number 2020-CP-004746. Ms. Ramirez is the mother and natural guardian of Mr. Scarfo's daughter, the sole beneficiary of the estate. At the time of his death, Roman Scarfo was unmarried and was a resident of Sarasota County, Florida.

3. Defendant, United States of America, is a sovereign nation and exists under the Constitution and the laws enacted by the United States Congress. The Federal Aviation

Administration (hereinafter "FAA") is, and at all times relevant to this lawsuit was, an agency of the United States Department of Transportation, organized and existing under the laws of the United States.

4. This is an action brought pursuant to 28 U.S.C. § 1346(b) and § 2671, to recover damages for the exclusive benefit of the Estate and surviving child of Roman Scarfo.

5. Plaintiff, Yeni Leslie Montoya Ramirez, as Administrator, brings and prosecutes this action on behalf of the Estate of Roman Scarfo; and his surviving minor child, B.S.

6. This Court has Subject Matter Jurisdiction over the defendant pursuant to the Federal Tort Claims Act, because the United States is the proper defendant in this action and, at all times relevant to this action, employees of the FAA were acting in their official capacity, in their performance of non-discretionary duties and under the authority of Defendant United States of America.

7. Plaintiff has complied with all conditions precedent to the filing of this action. Specifically, on November 13, 2021, Plaintiff served the initial administrative claims with the Federal Aviation Administration ("FAA") on behalf of the Estate. On July 13, 2022, (delivered July 20, 2022) Plaintiff sent a follow-up letter requesting status of the previously submitted claims. The United States has not denied the claims. A pre-suit mediation took place on December 18, 2024, and resulted in an impasse.

8. The law of the State of Florida applies to all issues in this case.

9. Pursuant to 28 U.S.C. §§ 89, 1391(e), and 1402(b) venue is proper in the Middle District of Florida because the negligent acts and omissions of U.S. Government employees occurred in Jacksonville, Florida.

10. Pursuant to the Florida Wrongful Death Statute, Defendant is liable for damages arising from Roman Scarfo's death because it was caused by the negligent acts and/or omissions of FAA employees acting within the course and scope of their employment.

## Factual Allegations

11. The subject aircraft was a 2003 Van's RV-9A (R/N N4889R).

12. On September 13, 2020, at approximately 1003 hours central daylight time, Hiram Yu ("Pilot Yu"), the pilot, and Roman Scarfo ("Scarfo") departed Jack Edwards Field (JKA), Gulf Shores, Alabama in the accident aircraft.

13. The intended flight destination was Ocala International Airport (OCF), Ocala, Florida.

## The Flight

14. The flight was conducted as an Instrument Flight Rules ("IFR") flight under the provisions of Title 14 CFR Part 91.

15. Scarfo only held a student pilot certificate, and asked Yu, a commercial pilot, to help fly the aircraft to OCF.

16. At 1149, during the cruise portion of the flight, the pilot requested to divert to Cross City Airport (CTY), Cross City, Florida due to inclement weather conditions along the intended route of flight.

17. At 1154:23, the pilot first contacted the Jacksonville, FL (ZJX) Air Route Traffic Control Center sector 13 controller while level at 9,000 ft above mean sea level (msl) and requested the RNAV (GPS)-A approach to CTY. The controller cleared the aircraft to fly direct to the initial approach fix, UGLUF.

18. At 1204:03, the sector 13 controller instructed the pilot to cross UGLUF at or above 3,000 feet and cleared him for the RNAV Alpha approach into Cross City.

19. The controller did not provide any weather information to the pilot, including the local altimeter setting, radar-depicted precipitation, weather advisories, or current CTY weather.

20. According to ADS-B data, at 1214:13 the airplane was in a left turn to the north with a Mode C reported altitude of 6,500 feet msl. The last ADS-B target was at 1214:27 at a reported altitude of 6,100 feet MSL.

21. At 1218:09, the sector 13 controller transmitted that radar contact with the accident aircraft was lost.

22. The last known position of the accident aircraft was at Latitude 29.68547° N, Longitude 83.5048° W, with an approximate pressure altitude of 5,725 feet (ft).

23. There is no evidence that an emergency call was made by the pilot.

24. The aircraft wreckage was located in shallow water about one mile offshore.

25. The pilot and the passenger were fatally injured in the crash and have never been recovered.

26. Distribution of the wreckage and subsequent evidence were indicative of an in-flight breakup.

**Weather**

27. On the morning of the accident, the pilot received a weather briefing through ForeFlight at 0730 and filed an instrument flight plan.

28. The NTSB retrieved Consolidated Storm Prediction for Aviation (CoSPA) images for 1200, 1210, 1215, and 1220. The data showed that rain shower activity was moving from

southeast to northwest with time and growing in aerial coverage. This data was available to the air traffic controllers at Jacksonville Center (ZJX).

29. The National Weather Service (NWS) utilized the Tallahassee (KTLH) WSR-88D weather surveillance doppler radar for the detection of precipitation. The KTLH WSR-88D provides weather radar data as part of the Next Generation Weather Radar (NEXRAD) system; a network of over 150 doppler weather radars that produce a mosaic weather image. The NEXRAD data is imported into the FAA Weather and Radar Processor (WARP). The WARP system is an en route weather system that provides NEXRAD information to air traffic controllers via the Display System Replacement (DSR) and provides meteorological products to the Center Weather Service Unit (CWSU) meteorologists and Traffic Management Specialists (TMU). En route controllers have access to precipitation information provided to the DSR via the WARP using NEXRAD data.

30. The aircraft did not have on-board weather radar and therefore relied on the air traffic controller to communicate weather information and guidance.

## COUNT I – NEGLIGENCE

Plaintiff re-alleges, and incorporates by reference, the allegations contained in paragraphs one (1) through thirty (30) above, and alleges further:

31. The FAA is an agency of the United States Department of Transportation and, by and through its officers, employees and agents, exercises sole and exclusive control of all aircraft operating within the controlled airspace of the United States. The FAA, through its officers, employees and agents, is required to provide weather briefing and air traffic control services to all aircraft, particularly those operating under instrument flight rules, within controlled airspace, and at airports with an operating control tower. At a minimum, the FAA is obligated to be

familiar with and comply with the procedures set forth in the applicable Air Traffic Control Manual, as well as those procedures found in other FAA manuals and orders. Applicable portions of the Air Traffic Control Manual required FAA controllers to provide air traffic control services including, but not limited to, providing accurate and timely weather advisories, as well as appropriate altitudes, airspeed, headings, clearances, flight vectors, aircraft separation, aircraft sequencing, safety notices, safety alerts, safety information and warnings.

32. According to FAA Order JO 7110.65 (the "FAA Manual"), the duty priority for air traffic controllers is to give first priority to separating aircraft and issuing safety alerts as required.[1]

33. Controllers are trained by the FAA that they "must become familiar with pertinent weather information when coming on duty and stay aware of current and forecasted weather information needed to perform ATC duties."[2]

34. Controllers are trained that they must issue pertinent weather they observe or that has been reported, issue precipitation information and intensity, and provide pilots with the location of the weather in relation to their aircraft.[3] This includes weather conditions such as funnel cloud activity, lines of thunderstorms, embedded thunderstorms, large hail, wind shear, microbursts, moderate to extreme turbulence, and light to severe icing.

35. The ERAM system used by the air traffic controllers processes flight and surveillance data, provides communications, and generates display data to air traffic controllers. ERAM has increased flexibility in routing around congestion, bad weather and other airspace restrictions.

---

[1] FAA Manual §2-1-2(a) and §4-7-10.
[2] FAA Manual §2-6-1
[3] FAA Manual §2-6-2, §2-6-4, §2-6-6.

36. ERAM provides core functionality for air traffic controllers and supports satellite-based systems such as ADS-B and data communication. Working together, all these systems enhance safety and improve efficiency. ADS–B is a performance-based surveillance technology that is more precise than radar. The accident aircraft was equipped with ADS-B and the ADS-B data was provided to the NTSB from the FAA. The data was of good quality and was used for the NTSB's investigation.

37. The replay of the controller's radar scope shows the displayed precipitation at 1203:50 just before the sector 13 controller cleared the pilot for the RNAV A approach. The replay also shows the last detected position of N4889R and the displayed precipitation at 1214:50, 23 seconds after the last ADS-B data was received from the aircraft. The controller had all of this information available in real time while communicating with the accident aircraft.

38. When the air traffic controller issued a clearance to the accident aircraft, she had the ability to see that the aircraft's route of flight for the approach would take the aircraft directly into an area with moderate to heavy precipitation that presented an unstable environment for the accident aircraft.

39. An air traffic controller is required to issue an altimeter setting to en route aircraft at least one time while the aircraft is operating in the controller's area of jurisdiction.[4]

40. On September 13, 2020, N4889R was operating under Instrument Flight Rules and was under the exclusive control and authority of the FAA through its officers, employees, and agents. FAA controllers at Jacksonville, FL (ZJX) Air Route Traffic Control Center had access to radar data which identified N4889R, its altitude, air speed and aircraft make and model, as well as complete and current weather information and weather warnings for N4889R's intended flight path.

---

[4] FAA Manual §2-7-2(c)

41. Pilot Yu requested and received radar services from an FAA air traffic controller during the route from Jack Edwards Fields to Ocala International Airport. En route, Pilot Yu requested to divert to CTY due to the weather.

42. The controller cleared Pilot Yu for the approach at CTY; however, she did not provide any weather information, including the local altimeter setting, radar-depicted precipitation, weather advisories, or the current local weather at CTY.

43. While following the controller's clearance instructions, Pilot Yu turned into an area of spiral rain bands and/or convective activity which were growing in size and intensity. The growing area of rain showers and thunderstorms was very unstable, with the potential for updrafts of about 12,000 ft/min.

44. The last ADS-B target for the accident aircraft was at 1214:27 at a reported altitude of 6,100 feet MSL shortly before radar and radio contact was lost, and the aircraft broke up in flight, killing both crew members.

45. Having undertaken the task of providing radar services to the aircraft, air traffic controllers assumed a duty to act carefully and not put the aircraft occupants at an undue risk of harm.

46. The United States, through the FAA and its air traffic controllers, breached its aforementioned non-delegable and non-discretionary duties when it negligently failed to use the reasonable care and diligence exercised by other air traffic controllers under the same or similar circumstances, and committing acts and/or omissions constituting negligence, as the term is defined by law, in the following respect or manner:

    a) by failing to comply with the minimum requirements and procedures contained within FAA Order JO 7110.65Y including, but not limited to:

b) failing to issue the local altimeter setting to the pilot per § 2-7-2C;

c) failing to issue radar depicted precipitation to the pilot per § 2-6-4;

d) failing to provide the pilot with pertinent center weather advisories (CWAs) per § 2-6-6;

e) failing to provide local weather for CTY per section § 2-1-2 and 4-7-10;

f) failing to provide pilot reports (PIREPS) per section §2-6-2;

g) failing to ensure the pilot received the weather and NOTAMs for KCTY IAW 7110.65 4-12-a3 and 5-10-2;

h) failing to issue any SIGMETs or CWA's from 1550 to 1630 UTC;

i) failing to issue a safety alert when the controller knew, or should have known, that the accident aircraft was at a position and altitude that placed it in an unsafe proximity to dangerous weather in its path;

j) failing to provide appropriate warnings and/or instructions as to any safe, alternative flight routes around said hazardous weather conditions; and

k) other acts, omissions and failures to be determined through investigation and discovery.

47. As a direct and proximate cause of ATC's negligence, as aforesaid, Plaintiff's decedent was fatally injured.

48. The crash was directly and proximately caused by the negligence of FAA personnel acting within the course and scope of their employment.

49. The negligence of FAA personnel did not involve discretionary acts.

50. As a direct, probable, foreseeable, and proximate result of Defendant's negligence, as aforesaid, Decedent's beneficiary has been deprived of the value of her father's

society, consortium, companionship, parental guidance, and protection. Decedent's beneficiary has also lost the past and future support and services that he would have contributed to her during his lifetime, had he lived, with interest. Decedent's beneficiary has experienced great mental pain and suffering and will continue to experience great mental pain and suffering in the future. Decedent's beneficiary is entitled to incidental damages as well as damages for Roman Scarfo's pain and suffering.

51. As a direct, probable, foreseeable, and proximate result of Defendant's negligence, as aforesaid, the Estate of Roman Scarfo has lost the value of his prospective earnings with interest thereon, lost the net accumulation beyond death reduced to present money value, and incurred funeral and burial expenses.

WHEREFORE, Plaintiff, on behalf of Decedent's sole beneficiary and the Estate of Roman Scarfo, hereby demands judgment for damages and costs of this action against Defendant, The United States of America.

Dated: February 21, 2025

SPOHRER & DODD, P.L.

/s/Keith L. Maynard
Keith L. Maynard, Esquire
Florida Bar No.: 36214
Robert F. Spohrer, Esquire
Florida Bar No.: 184500
76 S. Laura St., Suite 1701
Jacksonville, Florida 32202
Tel: (904) 309-6500
Fax: (904) 309-6501
Email:  kmaynard@sdlitigation.com
            rspohrer@sdlitigation.com
            swentz@sdlitigation.com
*Attorney for Plaintiff*